# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RYAN LASHAWN CHATMAN,

Defendant-Appellant.

UNPUBLISHED
December 6, 2016

No. 328246
Wayne Circuit Court
LC No. 15-000181-FC

Before: GADOLA, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to murder (AWIM), MCL 750.83, discharge of a firearm in or at a building causing injury, MCL 750.234b, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant, as a fourth habitual offender, MCL 769.12, to 30 to 50 years' imprisonment for the AWIM conviction, 30 to 50 years' imprisonment for the discharge of a firearm in or at a building causing injury conviction, 30 to 50 years' imprisonment for the felon in possession of a firearm conviction, and two years' imprisonment for the felony-firearm conviction. We reverse defendant's convictions and remand to a different judge for a new trial.

## I. BACKGROUND

This case arises from a shooting that occurred around 12:30 p.m. on November 21, 2014, at the home of Karla Mitchell at 12949 Penrod in Detroit. There were several undisputed facts elicited at trial. There was no dispute that the victim Kevin Lawless arrived at Mitchell's house around 8:00 a.m. to drink and play video games with defendant, Mitchell, and several other individuals—Michael "Mike" Grayson, Amanda Grayson, and Sharvell Elliot—who were also visiting Mitchell that day. It was also undisputed that some hours later, while in Mitchell's kitchen, Lawless and defendant began to argue. Further undisputed was that defendant had a gun, shot Lawless and fled Mitchell's home. Where Lawless and defendant diverged was regarding the events that took place during their argument leading up to the shooting.

Lawless testified that the shooting was preceded by an argument that started because defendant was "playing around with" a .9 mm semiautomatic and Lawless asked him to stop and put the gun away. Although Lawless explained that he and defendant were arguing with 10 feet between them, he said that at some point in the argument, defendant slapped him. Lawless did

-1-

not remember if he retaliated in any way, but remembered that he had no weapons on him that day. Lawless testified that after the slap, defendant raised his gun, and aimed it at Lawless. Lawless again insisted that defendant was 10 feet away as Lawless raised his left hand to protect his face and defendant pulled the trigger. Lawless fell to the floor, and watched as defendant jumped over his body and ran out of Mitchell's house.

Defendant denied playing with his handgun at all that day. According to defendant, once he and Lawless were alone, Lawless asked him to borrow money. Defendant testified that he refused, and Lawless, who was very intoxicated, became angry. Thereafter, a heated argument ensued, and Lawless shoved defendant. Defendant testified that he shoved Lawless back, and then Lawless grabbed a chair. Defendant said that when Lawless "charged toward" him with the chair raised, defendant pulled his handgun from his pocket and pointed it toward the floor. He explained that when Lawless tossed the chair toward him, it caused his arm to jerk back, and grab for the gun. Defendant testified that he had no intention to shoot Lawless, but had pulled the gun out because, although he had no particular reason to fear Lawless, Lawless had been acting irrationally and had threatened him with the chair. Defendant claimed that, during the struggle for the handgun, his finger pulled the trigger and the firearm discharged, shooting Lawless through the hand that had been reaching for the gun and in the side of the face.

## II. JUDICIAL BIAS

Defendant first argues that he was deprived of a fair trial when the trial judge extensively questioned witnesses and exhibited bias against defendant. We agree.

Defendant failed to preserve this issue by objecting to the trial court's questions at trial. *People v Stevens*, 498 Mich 162, 180; 869 NW2d 233 (2015); *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). We review unpreserved claims of judicial partiality for plain error. *Jackson*, 292 Mich App at 597. A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In other words, defendant must have been prejudiced by the plain error. *Id*. Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id*. at 763-764 (internal quotations and alterations omitted).

Defendant argues that he was denied a fair trial because the trial judge, through his questioning of witnesses, demonstrated bias to the jurors. Generally, a trial court "may interrogate witnesses, whether called by itself or a party." MRE 614(b). Recently, in *Stevens*, 498 Mich at 164, our Supreme Court clarified the proper scope of judicial questioning of witnesses:

> This Court has stated the central object of judicial questioning should be to clarify. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or to elicit additional relevant information. Judicial questioning, nevertheless, has boundaries . . . .

\* \* \*

-2-

It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally. It is essential that the judge not permit his own views on disputed issues of fact to become apparent to the jury. [*Id*.]

Further, the *Stevens* Court considered the issue of when judicial questioning constitutes conduct that pierces the veil of judicial impartiality and deprives a defendant of a fair trial:

A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id*.]

Additionally, to ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said, and a judge should avoid questions that are intimidating, argumentative, or skeptical. *Id.* at 175.

Defendant challenges the court's questioning of three witnesses: Lawless, Reverend Lumsie Fisher and Detective Lieutenant Bock. As for Lawless, defendant argues that several questions posed by the trial court were an unnecessary amplification of the prosecutor's case. Specifically, defendant takes issue with the court's questions isolating defendant as the only person with a weapon at Mitchell's house on the day of the incident:

*The Court*: [Lawless], let me ask you a couple of questions, okay, but look at the jury while I'm asking you the questions if you will, all right.

On the date that this incident happened, November 21, 2014, where did you come from when you went to [Mitchell's] house?

[*Lawless*]: My house.

*The Court*: Okay. And was anyone with you at your house before you went to [Mitchell's] house?

*Lawless*: No.

*The Court*: Now you've indicated that you've known [defendant] for some period of time and you were friends, right?

*Lawless*: Correct.

-3-

*The Court*:  On this particular day when you went to [Mitchell's] house, did you have any weapon on you?  Did you have a gun, a knife, anything?

*Lawless*:  No.

*The Court*:  Now you say that you were in the kitchen of this house and you were present, [defendant] was present.  Who else was present in the kitchen?

*Lawless*:  A guy named Mike, a young guy named Mike.

*The Court*:  A young guy by the name of Mike, okay.  Did Mike appear to you to have a weapon?

*Lawless*:  No.

*The Court*:  So the only person that had a weapon in this kitchen was [defendant]?

*Lawless*:  Correct.

Additionally, defendant challenges the court's questions regarding the nature of the disagreement and resultant struggle between defendant and Lawless as improperly based on an assumption that Lawless's testimony was true:

*The Court*:  Now you say that you had this argument with [defendant].  I'm a little - - I don't fully understand as to how long this argument ensued.  In other words, how long were you involved in this argument with [defendant]?  Was it just a couple minutes or was it like an hour or two?

*Lawless*:  No, it wasn't no hour or two.  It was a couple minutes.

*The Court*:  A couple minutes?

*Lawless*:  Yes.

*The Court*:  And how did it escalate to the point to where he wound up slapping you?  Did he slap you first or did - -

*Lawless*:  Yes.

*The Court*:  Okay.  And when he slapped you, what were you saying to him?  Had you said something to him?

*Lawless*:  No.

*The Court*:  Did you say anything to him or do anything that would have angered him as far as you know?

*Lawless*:  The only time I said something, I said about the gun.

-4-

Defendant also challenges the court's questions to Lawless regarding his version of the event as overstepping the limits of clarification and acting as a second prosecutor, as well as bolstering Lawless's good character:

> *The Court*: What did you say about the gun?
>
> *Lawless*: "Quit playing with the gun like that."
>
> *The Court*: "Quit playing with the gun like that."
>
> *Lawless*: Correct.
>
> *The Court*: And why did you tell him quit playing with the gun like that?
>
> *Lawless*: Somebody mess around and get shot.
>
> *The Court*: Someone could get hurt, okay. And when you said this to him, how far away from him were you?
>
> *Lawless*: About ten feet.
>
> *The Court*: About ten feet, like when the assistant prosecutor went up? Okay. What can you – demonstrate for us in some way, shape or form how he was playing with this gun. Could you stand up and show the jury? Don't talk now. Just demonstrate with your own hand as to how he was playing with it. Okay, so he was turning his hand from left to right or palm down to palm up, things like that?
>
> *Lawless*: Yes.
>
> *The Court*: And this handgun, can you describe this handgun to us? Do you know what the difference [sic] between a revolver and a semiautomatic?
>
> *Lawless*: It was a nine millimeter.
>
> *The Court*: It was a nine millimeter semiautomatic, right?
>
> *Lawless*: Correct.
>
> *The Court*: Have you ever fired a handgun?
>
> *Lawless*: No.
>
> *The Court*: A handgun – well, let me rephrase that. Okay, so this argument took place and he's playing with this gun twisting in his hand left to right. What was the conversation about that you had that this handgun came out to begin with?
>
> *Lawless*: Can you repeat that one more time?

*The Court*: In other words, what were you talking about when [defendant] pulled this handgun? I mean did he pull it out of his pants pocket, a jacket pocket or a shirt pocket or something?

*Lawless*: No, he just had it in his hand. He had it in his hand walking around the house.

*The Court*: He had it in his hand walking around the house?

*Lawless*: Correct.

*The Court*: Okay. When you saw this—well, not only that, but when you saw this handgun, why didn't you leave?

*Lawless*: Wasn't thinking, Your Honor. I was over there visiting a friend, a good friend of mine. Just wasn't thinking.

*The Court*: You weren't thinking. All right, just look at the jury now. Tell them.

*Lawless*: I just wasn't thinking. I should have left. I wasn't thinking.

*The Court*: Okay. Did you ever hit [defendant]?

*Lawless*: No.

*The Court*: Did you ever grab anything – well, you heard what other people had said to you, huh?

*Lawless*: Correct.

*The Court*: Okay. Do you remember ever grabbing a chair or anything?

*Lawless*: No.

*The Court*: Did you lay any hands on [defendant] at all?

*Lawless*: No.

*The Court*: And when you were shot, you were standing?

*Lawless*: Correct.

*The Court*: And you were about how far away from [defendant]?

*Lawless*: About ten feet.

*The Court*: And he had his arm directly pointed at your head?

*Lawless*: Correct.

*The Court*: Do you know what happened to [defendant] after you were shot?

*Lawless*: Jumped up – I was laying on the ground, he jumped over me and ran out the door.

*The Court*: Ran out the door?

*Lawless*: Correct, front door.

*The Court*: Okay. How many times were you shot?

*Lawless*: One.

*The Court*: One time?

*Lawless*: Correct.

Like in *Stevens*, the judge "interjected himself into direct examination and engaged in pointed cross-examination." 498 Mich at 248. Save the one clarifying question regarding the duration of the argument between Lawless and defendant, the remainder of the judge's questioning was repetitive of the prosecution's direct. The tone of the judge with this witness could not be gauged from the transcript. Through the judge's questioning, the jury again heard that Lawless was unarmed, slapped by defendant and had no memory of picking up a chair. The judge also had Lawless testify multiple times to the distance between himself and defendant, indicating that Lawless did not approach or charge at defendant. The judge unnecessarily elicited that Lawless himself had never fired a gun in his life. A review of the transcript depicts that Lawless's testimony was not complex and did not substantiate judicial intervention. Given the undisputed facts and two-day length of the trial, the judge's questions worked to highlight the prosecution's theory of the case.

Defendant also challenges the trial judge's questioning of Reverend Fisher, an individual present in the Mitchell home during the incident between Lawless and defendant. The judge also asked Reverend Fisher whether he saw Lawless or anyone else aside from defendant with a weapon on the day of the incident. Although the judge's questioning was brief, it was improper. Again, "the central object of judicial questioning should be to clarify." *Id*. at 173. Defendant admitted he had a gun. There was no basis for the trial judge to intervene in this witness's testimony. The only contested issue in this case was whether defendant shot Lawless unprovoked or in self-defense, and the question of who possessed weapons in the kitchen prior to the incident, while relevant, was not so difficult for the jury to discern that it required clarification from the judge. Lawless was the first witness to testify for the prosecution and testified to only defendant having a weapon. Asking the same questions to Reverend Fisher only reinforced Lawless's status as an unarmed victim and the prosecution's theory of the case.

Finally, defendant takes issue with the trial court's questioning of Detective Lieutenant Bock, the fingerprint analyst that matched defendant's fingerprints to those on the handgun:

-7-

*The Court*: So these matches that you found of the right index finger and left index finger, they matched whom?

[*Bock*]: So we retrieve our fingerprint cards - -

*The Court*: They matched whom?

*Bock*: The SID number - -

*The Court*: Just look at the jury, please.

*Bock*: The SID number 2128148T as in Tom, which on the fingerprint card indicated the name of Ryan Reynolds.

*The Court*: Were you given a fingerprint card of the defendant in this case, Ryan Chatman?

*Bock*: I did not retrieve the fingerprint card from the database in that name. I simply searched the database based on that state ID number and retrieved the fingerprint card that I could conduct a comparison with. In this particular case, the latent prints were very clear, so I only needed to use one fingerprint card, and the name on that particular fingerprint card that I used was the name of Ryan Reynolds.

*The Court*: I understand and I don't understand. Explain to me exactly what you just said. Were you ever provided a fingerprint card for the defendant in this case, Ryan Chatman, not Ryan Reynolds?

*Bock*: No. However, I was provided a state ID number. So the fingerprint cards are entered into the database based on the state ID number. Could this particular individual have 15 different fingerprint cards all under a different name? Yes. However the state ID number would remain consistent through all of those fingerprint cards. I only retrieved the one fingerprint card from the database, and the one fingerprint card that I used was the name of Ryan Reynolds.

*The Court*: All right. So the name of Ryan Reynolds is synonymous then with Ryan Chatman.

*Bock*: I did not compare any other fingerprint cards for that particular state ID number to each other. So could there be another fingerprint card under that same state ID number with the name of Ryan Chatman? Yes. I just didn't use it in my comparison.

*The Court*: Did you determine as to whether or not the state identification number not only matched that of Ryan Reynolds, but also matched that of Ryan Chatman?

*Bock*: I do not do that in my position. When the fingerprint cards are entered in the database through live scan, they are sent electronically to Lansing, and there are ten-print examiners which will confirm the fingerprint cards are the same individual, essentially linking a particular fingerprint card to that state ID number. So even if somebody gives an alias name, the ten-print examiner wil confirm that that fingerprint card belongs to that state ID number.

*The Court*: All, right, so did this state identification number also match that of Ryan Chatman as well as Ryan Reynolds or no?

*Bock*: I wasn't asked to do any comparison to other fingerprint cards in the database. I as only asked to compare the latent prints that I developed on the items to that particular SID number. So I did not confirm that all of the other fingerprint cards in the database were under the same name.

*The Court*: So Ryan Reynolds might be somebody different than Ryan Chatman, is that what you're telling me?

*Bock*: In the database there could be a fingerprint card for that particular state ID number under the name of Ryan Reynolds, but also one with the same known impressions and the same state ID number under a different name.

*The Court*: That's not what I'm asking.

In this instance, the judge's questions may have begun by seeking a point of clarification regarding the fingerprint analyst's process for comparison and identification, but the questioning transgressed to advocacy for the prosecution. The tone of the trial judge in questioning this witness appears argumentative. Detective Bock was not evasive. *Id*. at 175-176. She was clear in her testimony that it was not her job to connect fingerprints with specific individuals. The judge continued to prod however, and later when unsatisfied, accused the witness of speculating. It is apparent from the judge's line of questioning that the judge sought to prove that the state ID number used to identify certain fingerprints taken from the gun belonged to the defendant. It was improper for the judge to endeavor to make this point for the prosecution. While this was a point for the prosecution to elicit, regardless, there was little to gain from the conclusion, outside of a demonstration of guilt, when the possession and discharge of the gun, as well as injury to the victim were admitted.

A curative instruction immediately following the above colloquies, particularly between the judge and Lawless and the judge and Detective Bock, may have alleviated the appearance of advocacy for the prosecution. *Id* at 177. The jury in this instance however, was not instructed until the end of the trial that the judge's comments and questions were not evidence, and that they were not meant to influence their votes or express a personal opinion. While jurors are presumed to follow their instructions, *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), this was not a case of minor or brief inappropriate conduct, *Stevens*, 498 Mich at 177-178. The judge's questioning was unnecessary, reinforcing and biased in favor of the prosecution. We conclude that the judge's interference constituted plain error.

We also conclude that the plain error affected defendant's substantial rights. *Carines*, 460 Mich at 763-764. Independent of defendant's actual innocence, the judge's questioning seriously affected the fairness of the trial. *Id*. Issues of credibility, *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1988), and whether a defendant acted in self-defense, *People v Prather*, 121 Mich App 324, 330; 328 NW2d 556(1982), are questions of fact for the jury to decide. The competing accounts of Lawless and defendant made the determination of guilt turn on whose version was more credible. Defendant's self-defense theory, if successful, relied on the jury accepting that Lawless was the aggressor. Lawless's testimony supported the possibility. The judge's questions however, suggested that the defense theory was false. They highlighted to the jury Lawless's previous answers that he was unarmed, that defendant was the aggressor and that he had not encroached any less than ten feet toward defendant. Diametric to defendant, Lawless was positioned as concerned about gun safety, the safety of others and as someone who had never fired a gun. The judge's questions also touched on issues that would have given rise to reasonable doubt in the minds of the jury, namely Lawless's intoxication and failure to flee when defendant brandished the gun. Reversal is warranted " '[w]hen the trial judge's questions or comments were such as to place his great influence on one side or the other in relation to issues which our law leaves to jury verdict.' " *Id*. at 177 (citation omitted).[1]

Considering the factors enunciated in *Stephens*, the court's questioning of Lawless demonstrated the appearance of advocacy for the prosecution. Considering the totality of the circumstances, we conclude that the judge's questioning pierced the veil of judicial impartiality warranting reversal of defendant's convictions and a new trial. *Id*. at 164.

### III. PROSECUTORIAL MISCONDUCT

Defendant next argues that improper remarks made by the prosecutor during closing argument deprived him of a fair trial. We disagree.

Defendant preserved an argument related to improper burden-shifting by raising an objection on that ground in the lower court. *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). Preserved issues of prosecutorial misconduct are reviewed de novo to determine if the defendant was denied a fair and impartial trial. *Id*. However, arguments defendant raises on appeal for mischaracterization of facts and improper appeal to sympathy were not preserved. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights. *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).

---

[1] The prosecution argues that defendant's convictions cannot be reversed under *Stevens* where the issue of judicial bias was not preserved below. 498 Mich at 164 ("When the issue is preserved *and* a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review. Rather, the judgment must be reversed and the case remanded for a new trial.") (Emphasis added.). We disagree and hold that *Stevens* did not disturb the plain error standard of review for unpreserved claims of judicial bias, *Jackson*, 292 Mich App at 597, under which reversal is still an appropriate form of relief.

Improper remarks from the prosecutor rise to the level of prosecutorial misconduct and require reversal when they deprived defendant of a fair and impartial trial. *People v Watson*, 245 Mich App 572, 594; 629 NW2d 411 (2001). Issues of prosecutorial misconduct are decided on a case by case basis, and this Court must examine the entire record and consider the challenged remarks in context. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). A prosecutor's comments should be evaluated in light of defense arguments and the relationship the comments bear to the evidence presented at trial. *People v Brown*, 267 Mich App 141, 152; 703 NW2d 230 (2005).

Defendant first argues that the prosecutor, during closing arguments, impermissibly shifted the burden of proof onto defendant by suggesting that defendant should have produced witnesses to corroborate his defense. During rebuttal, the prosecutor stated:

> There's a reason that we don't consider hearsay, stuff that other people say coming in through other people. Number 1, who are these other people that apparently told [Lawless] that he threw a chair, right? Who are these other people? If these people were really there and these people really did see this stuff if they were one of the people who were actually in this house that the defendant rattled off all these names, we could have heard from them, right? He knows where they are. He could have brought that up to corroborate what he's saying. It's not there. It's not there, ladies and gentleman. These are people that he knows. These are friends of his. There's nothing to back it up ladies and gentleman.

A prosecutor may not imply that the defendant is required to prove something or to provide a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof. *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). However, a prosecutor's proper commentary on the weaknesses of a defense theory does not shift the burden of proof. *Id*. at 464-465. When a defendant testifies at trial or advances an alternate exculpatory theory of the case, the prosecutor's comments on the validity of the alternate theory do not "shift the burden of proving innocence to the defendant." *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995). Rather, when a defendant testifies in his own defense, the defendant's "credibility may be impeached and his testimony assailed like that of any other witness." *Id*. at 110 (quotation and citation omitted). Further, "[a] prosecutor's remarks must be considered in light of defense arguments." *People v Ackerman*, 257 Mich App 434, 453-454; 669 NW2d 818 (2003) (quotation and citation omitted). Otherwise, improper remarks may not rise to the level of error requiring reversal if the remarks were responsive to defense counsel's argument. *Watson*, 245 Mich App at 593.

In this case, the prosecutor's statements were comments on the validity of the story to which defendant testified, challenging that story in light of the other evidence presented at trial. Specifically, although defendant claimed that he accidentally shot Lawless in a struggle after Lawless hurled a chair at defendant, there was no evidence to support that version of events. Lawless did not remember throwing a chair at defendant or attacking him physically in any way. None of the responding officers to later testify at defendant's trial had observed an overturned chair or any other signs of a struggle in Mitchell's kitchen. Defendant's credibility was clearly at

issue, and the prosecutor's remarks were permissible, especially in rebuttal and as a response to defense counsel's assertions that defendant acted in self-defense:

> And he said that he was attacked, violently attacked, charged at with this chair.

> Now you saw a picture of the chair. It appears to be a metal chair. Could cause some serious damage to a person. And [defendant] indicated that [Lawless] was charging at him with this chair towards his head to the point that he had to move out of the way to avoid being hit in the head by this chair. And then there was a struggle that ensued.

The prosecutor's comments were based on the evidence presented at trial and directly responded to the defense theory of the case, and did not improperly shift the burden of proof to defendant.

Even if the prosecutor's statements had been improper, a new trial would not be warranted. In order for prosecutorial misconduct to be constitutional error, the misconduct must have so infected the trial with unfairness as to render the conviction a deprivation of liberty without due process of law. *People v Blackmon*, 280 Mich App 253, 269; 761 NW2d 172 (2008), citing *Donnelly v DeChristoforo*, 416 US 637, 643; 94 S Ct 1868; 40 L Ed 2d 431 (1974). Reversal is warranted only where a curative instruction could not have alleviated any prejudicial effect. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Here, the jury was instructed on how to consider a claim of self-defense. Additionally, the trial court properly instructed the jurors that the attorneys' arguments were not evidence, that the burden of proof was on the prosecutor to prove all charges beyond a reasonable doubt, and that defendant was not required to submit any evidence or prove his own innocence. Jurors are presumed to follow their instructions, and these instructions were sufficient to alleviate any prejudicial effect resulting from the prosecutor's comments. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Defendant also argues that the prosecutor committed misconduct by mischaracterizing facts and appealing to the jury's sympathies. Specifically, defendant challenges the prosecutor's characterization of defendant as "twice the size" of Lawless and his characterization of Lawless as only somewhat intoxicated as factually inaccurate, and the prosecutor's charge to the jury to review the 680 pages of medical records describing Lawless's gunshot injuries and consider defendant's failure to offer assistance to his wounded friend as improper appeals to sympathy for the victim.

Prosecutors may not make factual statements that are not supported by the evidence, but are typically afforded great latitude regarding their arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Although prosecutors should not blatantly appeal to the jury to sympathize with the victim, *Watson*, 245 Mich App at 591, they are generally free to argue the evidence and all reasonable inferences as may relate to their theory of the case, and are not required to confine their statements to the blandest possible terms, *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

Even if the challenged remarks were improper, and we believe they were not, defendant's claim fails because he cannot show that these comments resulted in prejudice to support a reversal on these unpreserved claims. The jury had the opportunity to view defendant and Lawless, both of whom testified at trial, and objectively consider their relative physical attributes. Further, they heard testimony from defendant regarding his claimed physical disabilities and the relative state of intoxication of both Lawless and defendant. The prosecutor's comment that defendant was "literally twice the size of [Lawless]" could not have had any real effect on the jurors' actual perceptions. The prosecutor's comments regarding the extensive injuries sustained by Lawless and defendant's failure to render assistance were based on evidence presented at trial and already available to the jurors. Further, these comments are intended to highlight facts that might create an inference of guilt and are therefore permissible. Finally, the jurors were instructed that the prosecution was required to prove each element of the crimes beyond a reasonable doubt, and that they should not let sympathy or prejudice influence their deliberations. Again, jurors are presumed to follow their instructions. *Abraham*, 256 Mich App at 278-279. Defendant has failed to establish prejudice and his prosecutorial misconduct claim therefore fails.

We reverse defendant's convictions and remand to a different judge for a new trial. We do not retain jurisdiction.[2]

/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens

---

[2] Defendant also challenges the scoring of his sentencing guidelines under *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). Given our disposition to remand for a new trial, we need not address those arguments.