# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TOSHI EDWARD WILLINGHAM,

        Defendant-Appellant.

UNPUBLISHED
August 15, 2017

No. 331267
Berrien Circuit Court
LC No. 2015-002016-FC

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of assault with intent to commit murder (AWIM), MCL 750.83, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to consecutive prison terms of 2 years for felony-firearm and 30 to 90 years for AWIM. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On May 11, 2015, Ashley Davis went to J&B's Liquor Store (J&B's) with Demetrious Howard and Kashmir Zahoui. Davis spoke with her cousin, Angela Hemphill, in J&B's parking lot. While Davis and Hemphill were talking, Zahoui told Davis that defendant, whom Davis had dated in the past, was behind her. Davis wanted to avoid defendant because she had fought with defendant's sister just a few days before. She returned to Howard's car, but defendant confronted her before she could leave.

Hemphill testified that an argument between defendant and Davis ensued and that as Howard began driving away, Davis called defendant or his sister a "bitch," and in response defendant took out a firearm and started shooting at Howard's car as it drove away. Because Davis was unavailable for trial, Benton Harbor Public Safety Department Officer Benjamin Ingersoll testified to Davis's account of the events as relayed to him during an interview conducted shortly after the shooting. According to Ingersoll, Davis indicated that she and Howard were leaving J&B's parking lot when defendant pulled out a gun and started shooting at Howard's car.

Howard was also unavailable for trial, but a recording of his preliminary examination testimony was played for the jury. Howard testified that defendant was not the man who had

-1-

shot at his car. Rather, the man who had shot at the car later approached Howard, identified himself as "Boo Man," apologized, and offered to pay for damages to the vehicle. Ingersoll testified, to the contrary, that when he interviewed Howard about the shooting, Howard stated that an unnamed person had come up to his car before the shooting and said to him, "Drive off, I'm gonna shoot," at which point Howard drove from the parking lot and the person shot at Howard's car. Ingersoll also testified that Howard never mentioned a person named "Boo Man" at any point after the shooting.

Davis called 911 from Howard's car. A recording of the 911 call was played for the jury. In the call, Davis stated that defendant had shot at her and that she was not going back to J&B's because she did not think that it was safe. Ingersoll met Davis at her home while another officer went to J&B's to secure the scene. At Davis's home, Ingersoll interviewed Davis and Hemphill, and recorded those interviews with his body camera. Recordings of those interviews were played for the jury. Ingersoll also investigated Howard's car at Davis's home and confirmed that four bullets had impacted the car.

The officer who responded to J&B's canvassed the parking lot and found seven shell casings. Ingersoll also canvassed J&B's at a later time and found an eighth shell casing. The shell casings were sent to the Michigan State Police (MSP) for analysis. An expert in firearm examinations testified that the casings were from nine-millimeter luger rounds that required a nine-millimeter caliber luger firearm to fire.

In an unrelated investigation, Benton Township Police Department Detective Brian Smit found a gun during a search of the residence where a Daniel Autry was staying. Shortly before the gun was found, defendant's brother, Kayjuan Spears, was seen leaving the home. The gun was sent to the MSP for analysis. An expert in firearm examinations testified that the gun was a nine-millimeter caliber luger firearm capable of firing the ammunition from the casings that were recovered at J&B's. The expert further concluded, based on his examination of four of the eight casings, that the ammunition was fired from the firearm that had been recovered by Smit. The results of the examination of the other four casings were inconclusive.

Defendant was subsequently interviewed by MSP Detective Sergeant Michael Logan. According to Logan, defendant originally told him that he had purchased the gun for $150 from a man nicknamed "Little Joe" and that he had sold the gun to Autry for $300 in May 2015. However, in a subsequent interview, defendant said that those statements were not true and that he had made them up to protect his brother, whom he knew was under investigation. Defendant stated that the only time he had handled the gun was when his brother handed it to him and he posed for a picture with it. That picture was entered into evidence at defendant's trial.

Before trial, the prosecution sought to admit, under MCL 768.27c, the recordings of the 911 call and Davis's interview with Ingersoll. Defendant objected, arguing that Davis's statements did not meet any hearsay exception and that, even if they did, the admission of

Davis's statements would violate the Confrontation Clause.[1] At a hearing on the matter, the trial court granted the prosecution's motion, and also held that Davis's statements were admissible as excited utterances and present sense impressions. The trial court also held that Davis's statements did not violate the Confrontation Clause because they were made to assist the police in addressing an ongoing emergency.

After the jury convicted defendant, he filed two motions regarding sentencing. First, defendant objected to being treated as a fourth-offense habitual offender, because his September 6, 2010 conviction for resisting and obstructing a police officer in Illinois was a misdemeanor and therefore could not be counted as a prior felony, and because he did not have a conviction for possession of marijuana in September 2012. Second, defendant contested numerous alleged errors in his presentence investigation report (PSIR), and the scoring of several sentencing guideline variables, including the assessment of 50 points for Offense Variable (OV) 6.

At sentencing, the trial court did not address any of defendant's challenges to the PSIR or any scoring challenges, including defendant's challenge to OV 6. The trial court only addressed part of defendant's challenge to his habitual offender status, determining that defendant's conviction for resisting and obstructing a police officer in Illinois could be considered a felony in Michigan for habitual-offender purposes. After the trial court held that this conviction was a felony, it concluded that defendant could be sentenced as a fourth-offense habitual offender. When the trial court asked defense counsel whether he had any other additions or corrections, defense counsel stated that the trial court had addressed each concern that defendant had raised in his two motions as well as his objections to the PSIR. Defendant was then sentenced as described. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support his conviction of AWIM. We disagree. "Challenges to the sufficiency of the evidence are reviewed de novo." *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and quotation marks omitted).

Our review of the sufficiency of the evidence is deferential. A "reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Gonzalez*, 468 Mich 636, 640-641; 664 NW2d 159 (2003) (citation and quotation marks omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded

---

[1] "The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "The scope of review is the same whether the evidence is direct or circumstantial." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (citation and quotation marks omitted). "Even in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but need merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide." *Hardiman*, 466 Mich at 423-424 (citation and quotation marks omitted).

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010) (citation and quotation marks omitted). In this case, defendant challenges the sufficiency of the evidence showing his actual intent to kill. "[A]n intent to kill for purposes of [AWIM] may not be proven by an intent to inflict great bodily harm or a wanton and wilful disregard of the likelihood that the natural tendency of the acts will likely cause death or great bodily harm." *People v Brown*, 267 Mich App 141, 150; 703 NW2d 230 (2005) (citation and quotation marks omitted). But a "[d]efendant's intent [can] be inferred from any facts in evidence," *Ericksen*, 288 Mich App at 196, including "the use of a deadly weapon," *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014), as well as

> the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made. [*Brown*, 267 Mich App at 149 n 5 (citations and quotation marks omitted).]

"Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient to establish a defendant's intent to kill." *People v Unger*, 278 Mich App 210, 231; 749 NW2d 272 (2008).

In this case, evidence was presented that Davis had attempted to avoid a confrontation with defendant. Before Davis could leave the area, however, defendant confronted her, pulled out a handgun (a dangerous weapon, see *Henderson*, 306 Mich App at 11), and discharged the weapon in Davis's direction. Defendant thus used "an instrument and means" that were "naturally adapted to produce death." *Brown*, 267 Mich App at 149 n 5. Defendant fired eight times, hitting the vehicle multiple times, which supports the inference that he intended to kill someone in the car. *Id*. Testimony from several witnesses supports the conclusion that Davis had had a serious fight with defendant's sister in the days before the shooting and that defendant's actions in approaching Davis may have been motivated by his ill will towards her. See *Brown*, 267 Mich App at 149 n 5. Viewing this evidence in the light most favorable to the prosecution, *Smith-Anthony*, 494 Mich at 676, taking into consideration all reasonable inferences arising from the evidence, *Gonzalez*, 468 Mich at 640-641, resolving all conflicts in favor of the prosecution, *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008), and deferring to

the jury's assessment of the weight of the evidence and the credibility of the witnesses, *Hardiman*, 466 Mich at 428, a rational trier of fact could have found sufficient circumstantial evidence, *Unger*, 278 Mich App at 231, to conclude that defendant intended to kill Davis.

Defendant argues on appeal that defendant's actions could also support the conclusion that defendant intended to scare, rather than kill, Davis. However, "the prosecution need not negate every reasonable theory consistent with the defendant's innocence." *Hardiman*, 466 Mich at 423-424. The evidence here was sufficient to allow a rational jury to convict defendant of AWIM.

## III. ADMISSION OF EVIDENCE

Defendant also argues that Davis's 911 call and her interview with Ingersoll contained hearsay statements not subject to an exception and should not have been admitted at trial. We disagree. We review for an abuse of discretion a trial court's decision on the admission of evidence. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo[.]" *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). The trial court's findings of fact in support of an evidentiary ruling are reviewed for clear error. *People v Barrera*, 451 Mich 261, 269; 547 NW2d 280 (1996). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008) (citation and quotation marks omitted). Even if admitted in error, such an error "does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013) (citation and quotation marks omitted).

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay is generally prohibited and may only be admitted at trial if provided for in an exception to the hearsay rule." *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). In this case, the trial court admitted the 911 call and Davis's interview with Ingersoll under MCL 768.27c (domestic violence exception), MRE 803(1) (present sense impression exception), and MRE 803(2) (excited utterance exception).

MCL 768.27c(1) allows a trial court to admit a statement (that may otherwise be hearsay) if all of the following apply:

(a) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

(b) The action in which the evidence is offered under this section is an offense involving domestic violence.

-5-

(c) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of a statement made more than 5 years before the filing of the current action or proceeding is inadmissible under this section.

(d) The statement was made under circumstances that would indicate the statement's trustworthiness.

(e) The statement was made to a law enforcement officer.

MCL 768.27c(2) provides that circumstances relevant to the determination of trustworthiness under MCL 768.27c(1)(d) include, but are not limited to, the following:

(a) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.

(b) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

(c) Whether the statement is corroborated by evidence other than statements that are admissible only under this section.

Defendant does not contest that MCL 768.27c(1)(a), (c), and (e) were satisfied, and the record indicates that those requirements indeed were clearly satisfied. However, defendant argues that MCL 768.27c(1)(b) was not satisfied because defendant was not "engaged in an offense involving domestic violence." We disagree.

An "offense involving domestic violence" for purposes of MCL 768.27c(1)(b) is defined in MCL 768.27c(5)(b) as follows:

"Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

(*i*) Causing or attempting to cause physical or mental harm to a family or household member.

(*ii*) Placing a family or household member in fear of physical or mental harm.

(*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

A "[f]amily or household member" includes "[a]n individual with whom the person has or had a dating relationship." MCL 768.27c(5)(b)(*iv*) Defendant does not dispute that he had previously been in a dating relationship with Davis, and that she was therefore a "family or household member" under MCL 768.27c(5)(b)(*iv*). Rather, defendant appears to argue that he was not engaged in an offense "involving domestic violence" because his conduct was in retaliation for the fight between Davis and his sister, and was unrelated to his own relationship with Davis.

However, the motivation for an offense is immaterial to whether it constitutes an "offense involving domestic violence" for purposes of MCL 768.27c(1)(b) and MCL 768.27c(5)(b). Moreover, an offense may "involve[] domestic violence" even though the defendant is not charged with the crime of domestic violence. In *People v Railer*, 288 Mich App 213, 220; 792 NW2d 776 (2010), we held that assault with intent to commit great bodily harm less than murder was an "offense involving domestic violence" because "[s]uch conduct constitutes 'domestic violence' " as defined by MCL 768.27b(5)(a). *Railer*, 288 Mich App at 220-221. Similarly in this case, the offense with which defendant was charged (AWIM) arose out of conduct (shooting eight times at his ex-girlfriend as she attempted to flee) that "involv[ed] domestic violence." *Railer*, 288 Mich App at 220-221. Accordingly, MCL 768.27c(1)(b) was satisfied.

Defendant also contends that the trial court erred by admitting Davis's statements under MCL 768.27c because the statements were not trustworthy and therefore were admitted in violation of MCL 768.27c(1)(d). The trial court never specifically addressed in its ruling whether Davis's statements were trustworthy. However, the trial court noted that the statements were corroborated by physical evidence, and it ultimately held that they were admissible under MCL 768.27c, thus necessarily (albeit impliedly) finding the statements to be trustworthy. Defendant asserts that, because Davis did not testify at any hearings, the trial court lacked a basis on which to conclude that she was not biased or did not have a motive for fabricating her statements. See MCL 768.27c(2)(b) (stating that one factor to consider in determining trustworthiness was possible bias or motive). Defendant argues that there was actually evidence to conclude the opposite, i.e., that Davis had a motive to fabricate her story and implicate defendant, because of the recent physical altercation between Davis and his sister. However, there is no evidence in the record, beyond the mere fact that the fight occurred, to support this assertion. To the contrary, the evidence suggests that by attempting to leave the vicinity after learning of defendant's presence, Davis sought to avoid any type of involvement with defendant.

Even if there were evidence that Davis may have been biased or may have had a motive to fabricate her story, proof of the factors that are specifically listed in MCL 768.27c(2) is not required for a finding of trustworthiness. Rather, MCL 768.27c(2) is merely a "nonexclusive list of possible circumstances that may demonstrate trustworthiness." *People v Meissner*, 294 Mich App 438, 449; 812 NW2d 37 (2011) (holding that "a lack of proof on the subsections [of MCL 768.27c(2)] did not require the trial court to exclude the statements"). With regard to the other listed factors, there is nothing in the record to indicate that Davis made the statements in anticipation or contemplation of litigation. MCL 768.27c(2)(a). And there was ample evidence that corroborated Davis's story: her 911 call matched the statement that she gave to Ingersoll; Hemphill reported largely the same series of events as did Davis; shell casings were found in the parking lot of J&B's; and four bullets had impacted the car. MCL 768.27c(2)(c). The trial court also considered other evidence that tended to indicate the trustworthiness of the statements, such as the amount of time between when the events occurred and when the victim gave her

statement, and the victim's agitated and upset demeanor when making her statements. See *Meissner*, 294 Mich App at 449 (stating that a trial court could consider factors outside of MCL 768.27c(2) when determining whether a victim's statements were trustworthy). Considering all the circumstances, the trial court did not err by finding that Davis's statements in the 911 call and to Ingersoll were admissible under MCL 768.27c.

Further, because we hold that the evidence was properly admitted under the domestic violence exception, MCL 768.27c, any error in admitting Davis's statements under MRE 803(1) and 803(2) would be harmless. See *Gursky*, 486 Mich at 620-621.

Defendant additionally argues that the admission of the 911 call and Davis's interview with Ingersoll violated his right of confrontation. We disagree. Whether the admission of evidence "violate[s] a defendant's Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo." *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012).

The protections of the Confrontation Clause apply "only to statements used as substantive evidence." *People v Fackelman*, 489 Mich 515, 525; 802 NW2d 552 (2011). "In particular, one of the core protections of the Confrontation Clause concerns hearsay evidence that is 'testimonial' in nature." *Nunley*, 491 Mich at 697-698, citing *Crawford v Washington*, 541 US 36, 51; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Statements "are testimonial when the circumstances objectively indicate that there is no [] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 US at 822. In contrast, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id*. "To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, [reviewing courts] objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v Bryant*, 562 US 344, 359; 131 S Ct 1143; 179 L Ed 2d 93 (2011) (citation omitted).

In this case, Davis's 911 call was clearly made with the primary purpose of assisting in an ongoing emergency. Davis called to inform the police of the shooting. Davis made the call immediately after the shooting occurred. Davis's call appeared to be "a call for help against a bona fide physical threat" as opposed to "a narrative report of a crime absent any imminent danger," which supports finding that the call was made to address an ongoing emergency. *Davis*, 547 US at 827. Moreover, Davis was so agitated by the events that the trial court, in listening to the 911 recording, had difficulty understanding her at times, tending to show that the statements were made "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id*. at 827. Consequently, Davis's 911 call was not admitted in violation of the Confrontation Clause because the primary purpose of the call was to objectively seek "to enable police assistance to meet an ongoing emergency." *Id*. at 828.

Similarly, the admission of Davis's statements to Ingersoll did not violate the Confrontation Clause. When Ingersoll responded to Davis's residence, all he knew was that there were shots fired near J&B's. When he questioned Davis, she told him that defendant had

-8-

shot at her, but she did not say why defendant had done so.  Ingersoll's subsequent questioning of Davis was objectively necessary to address an ongoing emergency.  See *Bryant*, 562 US at 360.  Ingersoll was aware that defendant was still at large and had a gun, see *id*. at 364 (stating that "the duration and scope of an emergency may depend in part on the type of weapon employed"), but was uncertain of defendant's motivation for shooting at Davis and whether this was an isolated incident, see *id*. at 372 (stating that it was significant in that the police were unsure of whether "the cause of the shooting was a purely private dispute or that the threat from the shooter had ended" in determining whether there was an ongoing emergency).  Ingersoll was therefore confronted with an ongoing emergency because he was uncertain whether defendant posed an ongoing risk to the public.  See *id*. at 370-371 (stating that "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.").  Defendant's location was unknown when Ingersoll questioned Davis.  See *id*. at 374 (stating that a finding of an ongoing emergency is supported if the threat's location remained unknown).  Accordingly, Ingersoll's questions to Davis were "the exact type of questions necessary to allow the police to ' "assess the situation, the threat to their own safety, and possible danger to the potential victim" ' and to the public," *id*. at 376 (quoting *Davis*, 547 US at 832), and did not violate defendant's right of confrontation.

## IV. SENTENCING VARIABLES

"Offense variable 6 is the offender's intent to kill or injure another individual."  MCL 777.36(1).  A trial court is to assess 50 points under OV 6 if "[t]he offender had premeditated intent to kill."  MCL 777.36(1)(a).  Defendant challenges the trial court's scoring of OV 6, arguing that it should have been scored at 25 points instead of 50 points.[2]  We disagree.  "Under the sentencing guidelines, the [trial] court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence."  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).  "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo."  *Id*.  "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made."  *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (citation and quotation marks omitted).

A jury's decision that a defendant had the requisite intent to kill for purposes of AWIM does not reach the issue of whether the intent was premeditated.  *People v Steanhouse*, 313 Mich App 1, 41; 880 NW2d 297 (2015), aff'd in part, rev'd in part on other grounds ___ Mich ___ (2017).  "Premeditation, which requires sufficient time to permit the defendant to take a second

---

[2] We note that there appears to be a second volume of the sentencing transcript from the lower court.  This Court requested that transcript, and defendant failed to provide it to this Court.  Defendant was responsible for providing that transcript on appeal.  MCR 7.210(B)(1)(a).  Failure to provide a relevant transcript "constitutes a waiver."  *People v Anderson*, 209 Mich App 527, 535; 531 NW2d 780 (1995).  Nonetheless, we address defendant's argument with reference to the record that is before this Court.

look, may be inferred from the circumstances surrounding the killing." *People v Coy*, 243 Mich App 283, 315; 620 NW2d 888 (2000). "[B]ut the inferences must have support in the record and cannot be arrived at by mere speculation." *Steanhouse*, 313 Mich App at 41. Factors that may be considered in determining premeditation include "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. at 40-41 (citation and quotation marks omitted).

Evidence was presented that, in the days leading up to the shooting, Davis had been in a serious fight with defendant's sister. As a result, when Davis became aware of defendant's presence at J&B's, she attempted to leave. However, rather than letting Davis leave, defendant confronted her. Defendant was carrying a firearm when he approached Davis, and he discharged the firearm eight times in her direction, both of which support a finding of premeditation. See *Coy*, 243 Mich App at 315. Based on all the facts and circumstances, there was sufficient evidence to conclude that defendant acted with premeditation, and the trial court properly assessed 50 points for OV 6. *Hardy*, 494 Mich at 438. Further, defense counsel was not ineffective in failing to object to the scoring of OV 6 at sentencing because an objection would have been meritless. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) (holding that defense counsel was "not ineffective for failing to raise meritless or futile objections").

## V. HABITUAL OFFENDER ENHANCEMENT

Defendant also argues that the trial court erred by sentencing him as a fourth-offense habitual offender because he only had one prior felony conviction. We disagree. "[T]he proper construction or application of statutory sentencing guidelines presents a question of law that is reviewed de novo." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

Defendant first argues that the trial court relied on a non-existent possession of marijuana conviction from September 12, 2012. A review of defendant's PSIR reveals, however, that on February 28, 2011 defendant pleaded to a charge of possessing 30 to 500 grams of marijuana, and that he was sentenced to 2 years' probation. That same charge indicates that, on September 12, 2012, defendant violated his probation and was subsequently sentenced to 18 months' imprisonment. There is no other reference to September 12, 2012 in defendant's PSIR. Therefore, it appears that, for habitual offender purposes, two of the listed felonies (possession of marijuana and a probation violation attendant to it) were actually one.

Nonetheless, defendant's PSIR reveals a 2010 conviction for manufacture/delivery of marijuana, and subsequent 2010 and 2011 convictions for second-offense and third-offense possessions of marijuana. All of these convictions fit the definition of a "felony" under the Code of Criminal Procedure, as they were punishable by imprisonment for more than one year. See MCL 761.1(g); *People v Smith*, 423 Mich 427, 445; 378 NW2d 384 (1985). And defendant admits on appeal that his conviction in Illinois for resisting and obstructing a police officer also fits this definition. Defendant thus was convicted of at least three prior felonies for purposes of the habitual offender statute, and any error was harmless. See *People v McAllister*, 241 Mich App 466, 473; 616 NW2d 203, 207 (2000), remanded on other grounds 465 Mich 884 (2001) ("However, when the alleged inaccuracies would have no determinative effect on the sentence, the court's failure to respond may be considered harmless error.").

Defense counsel was also not ineffective regarding this issue. Defense counsel is not required to make futile objections. See *Putman*, 309 Mich App at 245. Had defense counsel objected at sentencing to defendant's habitual-offender status, there is not a reasonable probability that the outcome would have been different. See *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

## VI. FELONY-FIREARM

In his Standard 4 brief,[3] defendant argues that there was insufficient evidence to support his conviction for felony-firearm because no evidence directly linked him to the gun that was admitted into evidence at trial. In the alternative, defendant argues that defense counsel was ineffective for not moving to suppress the gun on the ground that it could not be linked to defendant. We disagree. Again, we review de novo challenges to the sufficiency of the evidence. *Cline*, 276 Mich App at 642.

"The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). Defendant argues that there was insufficient evidence to prove that defendant had actual or constructive possession of the handgun that was admitted at trial. Defendant argues that the only evidence linking him to the handgun was the photograph of him holding it. However, Hemphill testified that defendant had a gun at J&B's and fired multiple rounds at Howard's car as he drove away with Davis. Ingersoll testified that Davis told him during their interview that defendant had fired at her as she was being driven away from J&B's in Howard's car. And Davis reported in her 911 call that defendant had fired a gun at her. Viewing this evidence in the light most favorable to the prosecution, *Smith-Anthony*, 494 Mich at 676, there was sufficient evidence for the jury to conclude that defendant possessed a firearm during the commission of the felony for which he was convicted. Defense counsel was not ineffective for moving to suppress the admission of the handgun because any such objection would have been meritless. See *Putman*, 309 Mich App at 245.

Affirmed.

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Brock A. Swartzle

---

[3] A supplemental brief filed in pro per by a criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.